UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JARED CRAMER,

      Plaintiff,

                                  Case No. 1:23-cv-1045

v.

                                  HON. JANE M. BECKERING

COUNTY OF OTTAWA, et al.,

      Defendants.

_____/

## OPINION AND ORDER

As the United States Supreme Court held more than a decade ago, "[t]he First Amendment is not a majority rule, and government may not seek to define permissible categories of religious speech." *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 582 (2014). This First Amendment case concerns the practice of opening county commission meetings with prayer and alleged violations of federal and state constitutional rights by the manner in which prayer givers were (or were not) chosen in a West Michigan county. Pending before the Court is Defendants' motion to dismiss the claims against them (ECF No. 12). For the reasons stated more fully herein, the claims alleged in this case are at least plausible, and the Court therefore denies the motion.

### I.      BACKGROUND

#### A.    Factual Background

Plaintiff Jared Cramer ("Reverend Cramer"), the priest at St. John's Episcopal Church ("St. John's") in downtown Grand Haven, Michigan, initiated this suit against Defendants County of Ottawa ("the County"); the Ottawa County Board of Commissioners ("the Commission"); and Joe

Moss ("Commissioner Moss") (First Am. Compl. (FAC) [ECF No. 7, as corrected by ECF No. 8] ¶ 12).

Commissioner Moss was elected in November 2022 to the Ottawa County Board of Commissioners (*id.* ¶ 8).  Before the election, Commissioner Moss founded Ottawa Impact ("OI"), a political action committee that he continues to lead (*id.*).  Candidates who ran for the Commission under the OI label won a majority of seats in the November 2022 election and currently hold a voting majority on the Commission (the "OI Commissioners") (*id.*).

On January 3, 2023, the Commission held its first meeting of the 2023–24 term, and the new OI Commissioners, including Commissioner Moss, assumed office (*id.* ¶ 19).  At this first meeting, the Commission voted to elect Moss to serve as Chairperson of the Commission (*id.* ¶ 9).  Reverend Cramer alleges that since Commissioner Moss' election to the Commission, Moss has "dedicated efforts toward undoing the County's efforts at inclusion," including, on the day he was sworn in, by leading the Commission's efforts to (a) dissolve the County's Office of Diversity, Equity, and Inclusion and (b) change the County's motto from "Where You Belong" to "Where Freedom Rings" (*id.* ¶ 10).

Reverend Cramer alleges that Commissioner Moss has also championed an "anti-LGBTQ+ agenda" (*id.* ¶ 11).  Reverend Cramer points out that early in Commissioner Moss' tenure, Commissioner Moss "attempted to hold up a grant that had been awarded to an LGBTQ+ advocacy group for a youth program" by initially refusing to sign his name and writing only "vi coactus," which is Latin for "having been forced" (*id.*).  Commissioner Moss ultimately signed the paperwork to release the funds (*id.*).

Reverend Cramer describes himself as "a leader in the faith community in speaking out against OI's efforts (*id.* ¶ 13).  In June 2023, Reverend Cramer and other faith leaders established

the Ottawa Coalition of Unifying Christians ("OCUC"), a coalition of congregations, clergy, and Christians in Ottawa County that united to take a public stand in response to the statements and actions of the OI Commissioners (*id.*).  Reverend Cramer currently sits on the steering committee of the OCUC (*id.*).  Reverend Cramer indicates that he has made "numerous public statements that are critical of the positions advanced by OI" and has been "outspoken in his belief that the OI Commissioners do not represent a uniform voice of Christianity in Ottawa County" (*id.* ¶ 14).

Reverend Cramer alleges that St. John's holds itself out as a place of worship that is "welcoming to all, including those in the LGBTQ+ community" (*id.* ¶ 15).  On its website, St. John's has a "Welcoming Statement" that includes the following language: "No matter who you are, whom you love, or where you are on your journey, we invite ALL people to join us and be fully involved in the ministry of Christ we share" (*id.*).  "Pride" events and the term "Pride" have come to be known as events or actions that support and celebrate inclusion and acceptance of citizens who identify as LGBTQ+, and St. John's flies the well-recognized rainbow "Pride flag" over the front door of its church building (*id.* ¶ 16).

Reverend Cramer alleges that he has also been a "visible advocate for the inclusion of members of the LGBTQ+ community, particularly within religious life," including by organizing the first worship service to recognize "Pride month" in Grand Haven, joining two other local pastors in leading the third annual Pride Worship Service in downtown Grand Haven, and helping to organize the first-ever Pride festival in Grand Haven in June 2023 (*id.* ¶¶ 16–17).  According to Reverend Cramer, the Pride festival, which St. John's sponsored, drew crowds numbering in the thousands (*id.* ¶ 17).  The County's Health Department provided information about Health Department services at the Pride festivals in Grand Haven and nearby Holland, Michigan (*id.* ¶ 18). In response, Commissioner Moss and other OI Commissioners passed a resolution critical of such

events and purporting to bar County resources from future similar gatherings (*id.*).  According to Reverend Cramer, the resolution claimed, in relevant part, that "Pride festivals are dangerous to children" and "endorse pedophilia" (*id.*).

Reverend Cramer alleges that since Commissioner Moss assumed office, Moss has led the Commission's public meetings, which are held twice per month (*id.* ¶ 26).  Each Commission meeting begins with a roll call, pledge of allegiance, and an invocation or prayer, with the prayer typically led by a leader of a local church (*id.*).  Reverend Cramer alleges that before Commissioner Moss was elected, it was the longstanding practice of the Commission to allow different Commissioners on a rotating basis to select individuals to lead the prayer at its meetings (*id.* ¶ 28).  For example, in 2022, Commissioner Roger Bergman, who represents the district where St. John's is located, selected Reverend Cramer to lead the prayer, and Reverend Cramer led the prayer in June 2022 (*id.* ¶ 29).

Reverend Cramer alleges, upon information and belief, that since Commissioner Moss became Chairperson, Moss selects the individuals who lead the prayer at meetings (*id.* ¶ 30). Reverend Cramer further alleges, upon information and belief, that "none of the individuals who have led the prayer have included statements of support for groups or causes disfavored by OI, including diversity and inclusion efforts, or the LGBTQI+ community" (*id.* ¶ 34).  Additionally, Reverend Cramer alleges, upon information and belief, that those who have been selected to offer the prayer before Commission meetings instead have the same or similar religious beliefs as Commissioner Moss, i.e., "they have represented politically conservative Christian churches that preach that being non-heterosexual is sinful or that God disapproves of transgender individuals" (*id.* ¶ 35).  Indeed, Reverend Cramer alleges that "[s]ome individuals who have led the prayer have included statements of praise for OI" and "some pastors have provided the prayer more than once"

(*id.* ¶ 33).  Reverend Cramer concedes that it is not possible to accurately identify every individual who has led the prayer because Commissioner Moss often introduces them only by their first name (e.g., "Pastor Dan") (*id.* ¶ 32).

Although Reverend Cramer previously led the prayer before Commission meetings, he did not receive an invitation or other outreach about giving the prayer after the OI Commissioners took over the majority on the Commission (*id.* ¶ 37).  Reverend Cramer wanted the opportunity to lead the prayer following the 2022 election, in part, "to give voice to the Christians in Ottawa County whose religious beliefs or views were not reflected by the other pastors who had led the prayer" (*id.* ¶ 38).  Reverend Cramer asked Commissioner Bergman to assist him in joining the rotation to give the prayer at a Commission meeting in 2023, but, according to Reverend Cramer, Commissioner Bergman advised him that "Moss alone" selects those chosen to give the prayer before Commission meetings (*id.* ¶ 39).

Reverend Cramer alleges that Defendants have failed to provide any public information about how the Commission selects individuals to give the prayer and that an individual who wishes to lead the prayer is therefore "left with no direction as to how to pursue the opportunity to do so" (*id.* ¶ 31).  Reverend Cramer admits that he did not contact Cindy Driesenga, who is serving in a new part-time position of Administrative Director to the Board of Commissioners (*id.* ¶ 20).  According to Reverend Cramer, the resolution appointing Driesenga stated that she would report to the Chairperson, i.e., Commissioner Moss, and further described the Administrative Director's duties as coordinating with the chairs of the standing committees to assist the Board in carrying out its duties and performing such other duties as assigned by the Chairperson (*id.*).  Reverend Cramer alleges that Driesenga's name and contact information do not appear on the County's website or in the 2023 Ottawa County directory (*id.* ¶ 21).

On May 9, 2023, Reverend Cramer sent an email to Commissioner Moss requesting the opportunity to lead the invocation at a Commission meeting (*id.* ¶ 42).  Reverend Cramer included on his email Commissioner Bergman, Commissioner Roger Belknap (who represents the district where Reverend Cramer resides), and County Administrator John Gibbs (*id.*).  Reverend Cramer did not hear back from any of the four recipients regarding his emailed request (*id.* ¶ 44).  On August 30, 2023, Reverend Cramer sent the same communication by registered U.S. Mail to Commissioner Moss, again asking for the opportunity to lead the invocation at a Commission meeting (*id.* ¶ 45).   He also did not hear back on his mailed request (*id.* ¶ 46).

### B.      Procedural Posture & Post-Filing Factual Allegations

On October 3, 2023, Reverend Cramer initiated this litigation with the filing of a Complaint (ECF No. 1).  Reverend Cramer alleges that after he initiated this litigation, Defendants invited Commissioners who are not affiliated with OI to select individuals to give the prayer (FAC ¶ 30).  Reverend Cramer alleges that until this litigation commenced, commissioners who were not affiliated with OI were not permitted to select or invite individuals to lead the prayer or to add individuals to any list of those invited to lead the prayer (*id.*).   Additionally, on November 15, 2023, counsel for the County reached out to Reverend Cramer's attorney to invite Reverend Cramer to give the invocation at the November 21, 2023 Commission meeting (*id.* ¶ 48).  Reverend Cramer had a scheduling conflict for the suggested date but was scheduled to lead the prayer in February 2024 (*id.*).

On December 4, 2023, Defendants moved to dismiss Reverend Cramer's Complaint (ECF No. 5) and attached an Affidavit from Commissioner Moss in support of their motion (ECF No. 5-2).   Rather than filing a response to the motion to dismiss, Reverend Cramer filed a First Amended Complaint (ECF No. 7, as corrected by ECF No. 8), and this Court therefore dismissed

the Motion to Dismiss as moot (Order, ECF No. 11).  In his First Amended Complaint, Reverend

Cramer alleges the following three claims:

I.   Violation of the Free Exercise Clause of the First Amendment to the U.S.
     Constitution—42 U.S.C. § 1983 as to all Defendants

II.  Violation of the Michigan Constitution, Art. 1, § 4 as to all Defendants

III. Violation of the Free Exercise Clause of the Establishment Clause of the
     First Amendment to the U.S. Constitution—42 U.S.C. § 1983 as to all
     Defendants

(ECF No. 7, as corrected by ECF No. 8).  As to each claim, Reverend Cramer seeks declaratory

relief, permanent injunctive relief, compensatory damages, punitive damages, and costs and

reasonable attorney fees.

At its January 2, 2024 Board of Commissioners meeting, the County added an "invocation

policy" to the Ottawa County Board of Commissioners Board Rules (ECF No. 12-1 at

PageID.108–109,  citing  https://www.miottawa.org/Departments/BOC/pdf/Board_Rules.pdf).

The Commission's recently adopted invocation policy provides the following:

It is the intent of the Board of Commissioners to allow a private citizen to bless the
proceedings of the Ottawa County Board of Commissioners. It is the rule of the
Board to allow for an invocation, which may include a prayer or a reflective
moment of silence, to be offered before its regular meetings for the benefit of the
Board.

The invocation shall not exceed three (3) minutes.

No member or employee of the Board or any other person in attendance at the
meeting shall be required to participate in any prayer that is offered, and such
decision shall have no impact on the ability of the person to actively and fully
participate in the business of the Board.

No member or employee of the Board will direct the public to stand, bow, or in any
way participate in the prayers; make public note of a person's presence or absence,
attention or inattention during the invocation; or indicate that decision of the Board
will in any way be influenced by the prayer opportunity.

The invocation shall be voluntarily delivered by a person listed on the Speakers List. To ensure that such person (the "Invocation Speaker") is selected from a wide pool representative of the local public, on a rotating basis, the invocation speaker shall be selected according to the following procedure:

1. A person designated by the Chairperson (the "Coordinator") shall compile and maintain a database (the "Speakers List") which contains the names and contact information for prospective Invocation-givers. The Speakers List shall also include the date when the request for an individual to be added to the list was made, as well as the affiliated church, temple, mosque, or other assembly the prospective speaker will represent, if applicable.

2. The Speakers List shall be compiled by including all religious leaders and other individuals who have properly been requested to be included on the Speakers List.

3. The Invocation rule is intended to be and shall be applied in a way that is all-inclusive of every religious assembly serving the citizens of Ottawa County. The Speakers List is compiled and used for purposes of logistics, efficiency, and equal opportunity for all of the community's religious leaders and other interested citizens, who desire to participate in the offering of an invocation prior to a Board of Commissioners meeting.

4. Any religious leader or individual who wishes to be added to the Speakers List must make a formal request to be added to the Speakers List, in writing, to the Board of Commissioners member representing the district in which they reside. Members of the Board of Commissioners who receive such requests shall forward all requests to the Coordinator.

5. The invitation to offer the opening invocation for a Board of Commissioners meeting shall be made to individuals on the Speakers List on a first-come, first-served basis. The Coordinator shall endeavor to invite all individuals on the Speaker List an equal number of times.

No invocation speaker shall receive compensation for his or her service.

No guidelines or limitations shall be issued regarding the content of an invocation, except that the Board of Commissioners shall request by the language of this rule that no invocation should proselytize or advance any faith, or disparage the religious faith or non-religious views of others, or attack, defame, or demean any person, group, or organization.

No invocation speaker shall be scheduled to offer an invocation at consecutive meetings of the Board of Commissioners, or at more than three (3) Board of Commissioners meetings in any calendar year.

> Neither the Board of Commissioners or any of its members, nor the Coordinator, shall engage in any prior inquiry, review of, or involvement in, the content of any invocation to be offered by an invocation speaker.
>
> This rule is not intended, and shall not be implemented or construed in any way, to affiliate the Board of Commissioners with, nor express the Board's preference for, any faith or religious denomination. Rather, this rule is intended to acknowledge and express the Board's respect for the numerous religious denominations and faiths represented and practiced among the citizens of Ottawa County.

(*id.*).

Ten days later, on January 12, 2024, Defendants filed a second Motion to Dismiss (ECF No. 12).  On February 9, 2024, Reverend Cramer filed a response in opposition to the motion (ECF No. 13).

Reverend Cramer indicates that he led the prayer before the Commission's February 13, 2024 meeting, but Commissioner Belknap led a "one-man protest" against him doing so (ECF No. 20 at PageID.196–197).  Specifically, before Reverend Cramer began his prayer, Commissioner Belknap posted a sign at the center of the dais where the Commission sits that stated, "The war on children.com" (*id.*).  Reverend Cramer indicates that Commissioner Belknap also participated in a media interview, confirming that he made and displayed the sign because Reverend Cramer was leading the prayer (*id.*).

On May 3, 2024, with leave of Court, Reverend Cramer supplemented his response to add facts and argument related to the February 13, 2024 Commission meeting (ECF No. 20).  On May 17, 2024, Defendants filed their reply to Reverend Cramer's response, as supplemented (ECF No. 21).  Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

9

## II.   ANALYSIS

### A.   Motion Standards

#### 1.   Rule 12(b)(1)

Defendants bring their motion pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6).  Rule 12(b)(1) authorizes the court to dismiss a claim for relief in any pleading if the court "lack[s] subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1).  If a movant challenges the court's subject-matter jurisdiction under Rule 12(b)(1), then "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Houchens v. Beshear*, 850 F. App'x 340, 342 (6th Cir. 2021).  A defendant can challenge subject-matter jurisdiction in one of two ways:  a facial attack or a factual attack. *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 861 (6th Cir. 2022).  "In a facial attack, a 'movant accepts the alleged jurisdictional facts as true and 'questions merely the sufficiency of the pleading' to invoke federal jurisdiction.'" *Polselli v. United States Dep't of the Treasury–Internal Revenue Serv.*, 23 F.4th 616, 621 (6th Cir. 2022) (citation omitted), aff'd sub nom. *Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023).  "A factual attack, by contrast, is advanced when the movant contests the alleged jurisdictional facts by introducing evidence outside the pleadings." *Enriquez-Perdomo*, *supra* (citation omitted).  "In such a case, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts, and the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Id.*

There is one important exception:  "a district court engages in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).  *See generally Arbaugh v. Y & H Corporation*, 546 U.S. 500, 511 (2006)

(discussing the "subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy"); *Smithers v. Smith*, 204 U.S. 632, 645 (1907) (discussing the jurisdictional amount-in-controversy requirement and opining that courts should not, "under the guise of determining jurisdiction," summarily decide the merits of a controversy between parties "without the ordinary incidents of a trial"). The Sixth Circuit has held that if "an attack on subject matter jurisdiction ... implicates an element of the cause of action," then courts must confine the jurisdictional inquiry to the allegations in the plaintiff's complaint, "no matter what evidence a defendant has submitted in attempting to disprove jurisdiction." *Harris v. Lexington-Fayette Urb. Cnty. Gov't*, 685 F. App'x 470, 472 (6th Cir. 2017) (citing *Gentek*, 491 F.3d at 330); *see also United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 782 F.3d 260, 265 (6th Cir. 2015) (applying the rule from *Gentek*); *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 814 (6th Cir. 2015) (same); *Bennett v. CMH Homes, Inc.*, 770 F.3d 511, 514 (6th Cir. 2014) (same).

2. <u>**Rule 12(b)(6)**</u>

Rule 12(b)(6), in turn, authorizes a court to dismiss a claim for relief in any pleading if it "fail[s] to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Although the plausibility standard is not equivalent to a "'probability requirement,' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).

In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When considering a motion to dismiss for failure to state a claim, a court generally does not consider matters outside the pleadings unless the court treats the motion as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016); *see also* FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) …, matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). However, a court may, without converting the motion to one for summary judgment, consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein[.]" *Gavitt, supra.*

### B.      Discussion

1.    <u>Defendants' Jurisdictional Challenges</u>

Federal "judicial power" does not extend to any dispute that might arise between any two people in the United States; rather, the power extends only to resolving "Cases" and "Controversies." *OverDrive Inc. v. Open E-Book F.*, 986 F.3d 954, 957 (6th Cir. 2021) (quoting U.S. CONST. Art. III, § 2). Additionally, a claim is not amenable to the judicial process when it is filed "too early (making it unripe)" or filed "too late (making it moot)." *Id.* (quoting *Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), and *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc)).

Under Federal Rule of Civil Procedure 12(b)(1), Defendants first pose three jurisdictional challenges to Reverend Cramer's claims, arguing that because Reverend Cramer has never been denied the opportunity to give a prayer or invocation at a Commission meeting, there is no case or controversy, and his claims are unripe and/or moot. Reverend Cramer responds that Defendants' arguments share the same fundamental flaw, to wit: Defendants urge the Court to accept their version of the facts and ignore the well-established rule that the Court must accept a plaintiff's allegations as true at this stage of the litigation. While the parties' arguments overlap in several factual respects, the legal analyses of each of the three threshold jurisdictional topics is discrete, and the Court therefore considers each topic, in turn.

     a.    *Case or Controversy*

According to Defendants, Reverend Cramer's claims are "completely abstract" and "hypothetical" (ECF No. 12-1 at PageID.114). Defendants argue that Reverend Cramer lacks an "injury-in-fact" because he was "never denied" an opportunity to give a prayer or invocation (*id.* at PageID.112–113). Defendants opine that Reverend Cramer's legal conclusions are instead "assumptions based upon him not receiving a timely response from Ottawa County" (*id.* at PageID.114). Defendants contend that they have "no objection whatsoever to him giving a prayer or invocation at a [Board of Commissioners] meeting," and they emphasize that they have a no-discrimination practice when selecting persons to give a prayer or invocation, which is now codified in its Board Rules (*id.* at PageID.113).

In response, Reverend Cramer argues that Defendants' mere disagreement with his factual allegations does not mean that there is no "case or controversy" (ECF No. 13 at PageID.152).

Reverend Cramer asserts that the bases for Defendants' argument—that Defendants have a practice of not discriminating against speakers on the basis of religion and never did anything to harm Reverend Cramer—are "the very issues in dispute" (*id.*).  Indeed, Reverend Cramer argues that Commissioner Belknap's reaction to his leading of the prayer in February demonstrates the "factual fallacy" of Defendants' position (ECF No. 20 at PageID.198).

Defendants' argument for dismissal lacks merit.

As the United States Supreme Court recently reiterated, the case-or-controversy requirement is "'fundamental to the judiciary's proper role in our system of government.'"  *Murthy v. Missouri*, No. 23-411, 2024 WL 3165801, at *7 (U.S. June 26, 2024) (citations omitted).  "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."  *Id.* (citation omitted).

To establish an injury-in-fact, which is the focus of Defendants' first jurisdictional challenge, a plaintiff must show that he suffered harm "that is concrete, particularized, and actual or imminent."  *Mackinac Ctr. for Pub. Policy v. Cardona*, 102 F.4th 343, 351 (6th Cir. 2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).  A "concrete" injury "must actually exist" and be "real, and not abstract."  *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).  A "particularized" injury "affect[s] the plaintiff in a personal and individual way." *Id.* (quoting *Spokeo*, 578 U.S. at 340) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).  The harm alleged in First Amendment cases is the "chilling effect" on the constitutionally protected right to free expression, which, the Supreme Court has stated, is "of transcendent value to all society."  *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 285 (6th Cir. 1997) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)).

Here, Defendants' claim that Reverend Cramer lacks an injury-in-fact depends on the factual finding that he was "never denied" an opportunity to give a prayer or invocation. That proposed finding implicates the merits of Reverend Cramer's claims that his constitutional rights were violated. Cognizant of the direction that a district court should not weigh evidence if the facts necessary to sustain jurisdiction implicate the merits of a plaintiff's claim, the Court instead accepts Reverend Cramer's alleged jurisdictional facts as true and questions merely the sufficiency of the pleading to invoke federal jurisdiction. *See Polselli*, 23 F.4th at 621. In this regard, Reverend Cramer's allegations sufficiently demonstrate a concrete, particularized, and actual harm. Specifically, Reverend Cramer alleges that Defendants, in failing to respond to his requests or otherwise include him in the list of individuals invited to give the prayer at Commission meetings, refused him the opportunity to lead the prayer because of, and in retaliation for, his expression of religious beliefs that are different from the religious beliefs of the OI Commissioners (FAC ¶¶ 54, 61, 69–70, 77–78). The Court concludes that his pleading is sufficient to demonstrate an injury-in-fact in satisfaction of the case-or-controversy requirement.

      b.   *Ripeness*

Next, Defendants posit that Reverend Cramer's "entire alleged claim is based upon his assumption that he will be denied the opportunity to give a prayer or invocation" (ECF No. 12-1 at PageID.120). Defendants argue that "[s]uch an unfounded, hypothetical future event is not grounds for a lawsuit and does not present a ripe claim," particularly where "it is clear that there is no dispute between the parties" and Reverend Cramer "will soon be giving a prayer or invocation" (*id.*).

In response, Reverend Cramer argues that his claims are ripe for review because "they are anchored in events that have already transpired" (ECF No. 13 at PageID.155). Reverend Cramer

emphasizes that there is "absolutely no legal requirement that a party is required to attempt prelitigation negotiation for a claim to be ripe," and Reverend Cramer points out that the failure to respond to a request is a constructive denial of the request (*id.*).

Defendants' argument for dismissal lacks merit.

"Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Nat'l Rifle Ass'n*, 132 F.3d at 284. The ripeness doctrine is intended to "prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985). The Sixth Circuit has explained that "[t]he ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but [the doctrine] also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances." *United States v. Lindahl*, No. 22-2117, 2024 WL 378274, at *3 (6th Cir. Feb. 1, 2024) (citing *Brown v. Ferro Corp.*, 763 F.2d 798, 801 (6th Cir. 1985), and *Jackson v. City of Cleveland*, 925 F.3d 793, 807 (6th Cir. 2019)). *See also Doe v. Univ. of Michigan*, 78 F.4th 929, 942 (6th Cir. 2023) (similarly indicating that in considering whether a claim is "ripe for judicial resolution," the court should ask not only whether the claim "arises in a concrete factual context" but also, "what is 'the hardship to the parties of withholding court consideration'?") (quoting *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)).

Here, for the reasons previously stated, the harm alleged by Reverend Cramer is anchored not in future events but in disputed interpretations of past events. His pleading sufficiently alleges a concrete factual context from which his claims arise. The Court further determines that judicial

resolution of the claims would be desirable under all of the circumstances.  In short, Reverend

Cramer did not file his case "too early."

     c.    *Mootness*

Last, Defendants argue that even assuming arguendo that there was a controversy at some

point in time, "there is undoubtedly no controversy now that Plaintiff is aware that Ottawa County

does have a practice of non-discrimination for prayers and invocations, that Ottawa County has

codified and implemented a written invocation policy, that no person has ever been denied the

opportunity to give a prayer or invocation, and that Plaintiff will be giving the prayer or invocation

on February 13, 2024" (ECF No. 12-1 at PageID.115–116).[1]

In response, Reverend Cramer argues that the law is abundantly clear that Defendants

cannot evade review by simply implementing a written policy and changing course (ECF No. 13

at PageID.148).  According to Reverend Cramer, the invitation to him to pray is "exactly the type

of voluntary cessation that does not moot a case," and the Commission's decision to "change its

own rules because of a lawsuit" is not entitled to the kind of "solicitude" granted to government

officials where the Board "simply amended its own operational rules and could easily change those

rules again at any time" (*id.* at PageID.149).  Reverend Cramer emphasizes that Defendants

"ignored the request completely until they were sued" (*id.* at PageID.158).

---

[1] In further support of their argument, Defendants contend that this Court has "wide discretion" to review affidavits to resolve disputed jurisdictional facts, and they argue that a cursory review of Commissioner Moss' affidavit "provides all of the necessary information for this jurisdictional issue and demonstrates that there is no real dispute between the parties" (ECF No. 12-1 at PageID.119).  However, Defendants did not attach Commissioner Moss' affidavit to the motion at bar, only their first motion to dismiss, which this Court dismissed as moot.  In any event, Defendants' description of the standard for resolving a Rule 12(b)(1) motion overlooks the exception the Sixth Circuit described in *Gentek*, 491 F.3d at 330 ("[A] district court engages in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim.").

Defendants' argument for dismissal lacks merit.

"'The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties.'" *Coal. for Gov't Procurement v. Fed. Prison Indus.*, 365 F.3d 435, 458 (6th Cir. 2004) (citation omitted).  "[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Id.*  Voluntary cessation of alleged illegal conduct will only moot a case "where there is 'no reasonable expectation that the alleged violation will recur,' and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)).

According to the Supreme Court, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).  The Sixth Circuit has likewise instructed that courts should take into account "the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed." *Speech First*, 939 F.3d at 767–68.

The "burden in showing mootness is lower when it is the government that has voluntarily ceased its conduct," and "'cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties' and that '[the government's] self-correction provides a secure foundation for a dismissal based on mootness so

long as it appears genuine.'" *Id.* at 767 (citation omitted).   In particular, the passage of new legislation or the repeal of challenged legislation presumptively moots a case "unless there are clear contraindications that the change is not genuine." *Id.*   When regulatory changes are implemented with "legislative-like procedures" or "formal processes," the government "need not do much more than simply represent that it would not return to the challenged policies." *Id.* And when a change is "ad hoc, discretionary, and easily reversible" or requires little in the way of formal process, "significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Id.*

For example, in *Speech First*, the University of Michigan was sued by a student organization challenging the University's policy prohibiting harassment and bullying as overbroad and vague.  939 F.3d at 761–62. After the plaintiff-organization filed its complaint, the University removed the challenged definitions of bullying and harassment from its policy but continued to argue in court that those definitions did not violate the First Amendment. *Id.* at 769–70.  The Sixth Circuit determined that the change was not legislative, and the Sixth Circuit considered the timing of the University's change of policy "suspect" and the University's continued defense of its policy in court as indicative that the University was likely to continue in the challenged conduct. *Id.*  The Sixth Circuit concluded that the district court had erred in determining that the claims challenging the policy were moot and remanded the case back to the district court to consider the merits of the issue. *Id.* at 761.

The Sixth Circuit reached a different conclusion in *Davis v. Colerain Township*, 51 F.4th 164 (6th Cir. 2022).   In *Davis,* the plaintiff brought a 42 U.S.C. § 1983 action against Colerain Township, alleging that its policy of precluding "disrespectful" remarks at board meetings violated the First Amendment.   *Id.* at 168.   After the lawsuit was filed, Colerain Township voluntarily

changed the policy. *Id.* at 175. When considering whether the voluntary cessation rendered the litigation moot, the Sixth Circuit noted that just before the change in policy, legal counsel had informed Colerain Township about a recent Sixth Circuit decision holding that another town's restrictions on "abusive" or "antagonistic" statements at board meetings violated the First Amendment. *Id.* The Sixth Circuit concluded that Colerain Township had changed its policy in light of an external factor—recent and controlling Sixth Circuit precedent—rather than with the intent to moot and thereby thwart the plaintiff's lawsuit. *Id. See also Doe*, 78 F.4th at 947 (also finding that an external factor in the form of new binding precedent from the Sixth Circuit precipitated the change in the University's policy under examination).

Here, Defendants identify no external factor that precipitated the passage of the Commission's Invocation Policy. While Defendants contend that the policy merely confirmed and codified the Commission's longstanding practice of non-discrimination, the timing of its passage—on the heels of Reverend Cramer's lawsuit—is nonetheless suspect. Additionally, the interim events described by Reverend Cramer on February 13, 2024 reinforce, rather than eradicate, the effects of the alleged violation. Having examined the totality of the circumstances surrounding the voluntary cessation in the existing record, the Court determines that Defendants have not borne their burden of demonstrating that the allegedly wrongful behavior could not reasonably be expected to recur.

Last, the Court notes that as to each claim, Reverend Cramer seeks the following forms of relief: (1) declaratory relief that Defendants have violated and continue to violate the constitutional provision at issue by "utilizing a discriminatory policy or practice for selection of individuals to lead the prayer at Commission meetings and by preventing Reverend Cramer from leading the prayer;" (2) permanent injunctive relief requiring Defendants to "adopt and abide by a policy of

non-discrimination for selecting individuals to lead the prayer at Commission meetings and adding Reverend Cramer to the rotation of individuals who are invited to lead the prayer;" (3) compensatory damages; (4) punitive damages; and (5) costs and reasonable attorney fees.  Even assuming arguendo that the new Invocation Policy partially renders moot Reverend Cramer's request for relief, there remain forms of relief that would, if granted, make a difference to the legal interests of the parties.  In sum, Reverend Cramer did not file this case "too late."

**2.**      **Defendants' Challenges to the Sufficiency of the Factual Allegations**

a.      *Counts I–III*

Next, under Federal Rule of Civil Procedure 12(b)(6), Defendants argue that this Court should dismiss Reverend Cramer's First Amended Complaint "in its entirety" because he does not allege "any specific wrongful act" that violates his constitutional rights; instead, according to Defendants, Reverend Cramer merely states "an extended rendition of alleged political and religious differences" between himself and some of the commissioners and assumes that Defendants' inaction or lack of a response amounts to a constitutional violation (ECF No. 12-1 at PageID.121–126).

In response, Reverend Cramer asserts that Defendants' argument that he has failed to state any claim for relief is simply a repeat of their jurisdictional arguments with a different heading (ECF No. 13 at PageID.156–157).  According to Reverend Cramer, Defendants' actions violated their now-enacted policy, and, at this stage in the litigation, it is reasonable to infer that Defendants' actions were discriminatory (*id.* at PageID.157).

Defendants' argument for dismissal lacks merit.

The First Amendment to the United States Constitution, in pertinent part, prohibits the making of any law "respecting the establishment of religion" or "prohibiting the free exercise

thereof[.]" U.S. CONST., amend. I. The "touchstone" for evaluating Establishment Clause cases "is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary Cnty., Kentucky v. ACLU of Kentucky*, 545 U.S. 844, 859 (2005) (citation omitted). *Cf. Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 495 (2017) (Sotomayor, J., dissenting) (describing the Religion Clauses of the First Amendment as containing both "a promise from our government and a backstop that disables our government from breaking it"). Michigan's Constitution has corresponding guarantees, providing, in pertinent part, that "[e]very person shall be at liberty to worship God according to the dictates of his own conscience" and that "[t]he civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief." MICH. CONST. Art. 1, § 4.

Without specifying a deficiency in any specific element of any specific claim, Defendants broadly contend that Reverend Cramer did not allege a "specific wrongful act" in his First Amended Complaint. Given the lack of specificity in Defendants' argument for dismissal, the Court will likewise paint with a broad brush in resolving the argument.

As noted, to survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 557, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. While Defendants disagree with Reverend Cramer's alleged interpretation of the events, their mere disagreement does not provide a basis for dismissal. Rather, this Court must construe the allegations in the light most favorable to Reverend Cramer and accept all well-pleaded factual allegations in the First Amended Complaint as true. *See Thompson*, 773 F.3d at 750. Viewed in

that light, his allegations identify a "specific wrongful act," to wit:  Defendants' refusal to allow him (and likeminded clergy) the opportunity to lead the prayer "because of" or "in retaliation for" religious beliefs that differ from the beliefs held by OI Commissioners.  *See* FAC ¶¶ 53, 61, 69, & 78.  Reverend Cramer has alleged sufficient factual content to "nudge" his claims across the line from "conceivable" to "plausible."  *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570).  Defendants' argument does not support dismissal of Counts I, II, or III under Rule 12(b)(6).

  b.  *Retaliation Claims (Counts I & II)*

  Next, Defendants argue that this Court should dismiss Reverend Cramer's retaliation claims in Counts I and II because, according to Defendants, "no 'adverse action' has ever been taken" against Reverend Cramer, and the opposite is true inasmuch as Reverend Cramer gave the invocation in February 2024 (ECF No. 12-1 at PageID.127).  Moreover, Defendants contend that the record contains "no evidence that Ottawa County not providing a timely response 'would deter a person of ordinary firmness from continuing to engage in that conduct'" and "no evidence whatsoever of a non-timely response being 'motivated at least in part by the Plaintiff's protected conduct'" (*id.* at PageID.127–128).

  In response, Reverend Cramer asserts that Defendants' arguments are premature (ECF No. 13 at PageID.158).  Reverend Cramer argues that he plausibly alleged that Defendants failed to respond to him or invite him to lead the prayer because of his statements and beliefs, allegations that are more than sufficient to survive Defendants' motion to dismiss (ECF No. 13 at PageID.159, citing FAC ¶ 53).  Reverend Cramer argues that he has also sufficiently alleged that Defendants' exclusion of him from this aspect of public life—a practice that religious leaders with different beliefs were granted—would deter a person of ordinary firmness from engaging in protected conduct (*id.*).

Defendants' argument for dismissal lacks merit.

Reverend Cramer's retaliation claim in Count I is brought under 42 U.S.C. § 1983. "To survive a motion to dismiss a claim under 42 U.S.C. § 1983, a plaintiff must properly allege two elements: (1) the defendant was acting under color of state law, and (2) the offending conduct deprived the plaintiff of rights secured under federal law." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). With regard to the second element of a § 1983 claim, when the alleged violation of federal law is that a government official retaliated against a plaintiff for exercising his constitutional rights, as in this case, the plaintiff must ultimately prove three sub-elements: "(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.* at 717. Neither party indicates that Reverend Cramer's state-law retaliation claim in Count II would be differently analyzed.

The parties in this case have not yet begun discovery. Contrary to Defendants' argument about what the evidence will ultimately show regarding the adverse-action element, the Court, at this stage in the litigation, need only determine whether Reverend Cramer has plausibly *alleged* that Defendants took an adverse action against him. A Rule 12(b)(6) motion tests the legal sufficiency of a complaint, not the legal sufficiency of the evidence. *See generally RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). In addition to his allegation that Defendants retaliated against him by refusing to allow him the opportunity to lead the prayer (FAC ¶¶ 61 & 69), Reverend Cramer further alleges that the exclusion caused him to feel "offended, insulted, and discriminated against" (*id.* ¶ 55). While the record the parties eventually

compile in this case may dictate a different result, Defendants' argument does not support dismissal under Rule 12(b)(6) of the retaliation claims in Count I or Count II.

3.   **Commissioner Moss' Request for Qualified Immunity at the Pleadings Stage**

Last, Defendants make a brief, essentially one-page, argument that if this Court does not dismiss this case in its entirety, then this Court should dismiss Commissioner Moss as a Defendant[2] based on the doctrine of qualified immunity (ECF No. 12-1 at PageID.129–130).  Defendants reiterate that the lack of a response to an email or a letter does not amount to a constitutional violation, let alone a violation of a "clearly established" right (*id.* at PageID.130).

In response, Reverend Cramer argues that Defendants' argument "misses the mark" (ECF No. 13 at PageID.159).  Reverend Cramer argues that he has adequately pled that Commissioner Moss intentionally excluded him from the opportunity to lead the prayer by ignoring his requests on two separate occasions (*id.*).  According to Reverend Cramer, a formal rejection from Commissioner Moss was not necessary where it was "loud and clear" after waiting for more than five months without a response from any of the Commissioners he contacted that his request would not be granted (*id.* at PageID.161).

Defendants' argument for dismissal of Commissioner Moss lacks merit.

The Supreme Court has held that a defendant asserting qualified immunity is entitled to dismissal before the commencement of discovery "[u]nless the plaintiff's allegations state a claim of violation of clearly established law[.]"  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Hence, the Sixth Circuit has instructed that district courts have a "duty" to address qualified immunity when it is "properly raised prior to discovery."  *Myers v. City of Centerville, Ohio*, 41 F.4th 746,

---

[2] Defendants do not limit their qualified immunity argument to the § 1983 claims in Counts I and III, an oversight that the Court does not address, given the Court's conclusion herein.

758 (6th Cir. 2022) (citation omitted).  Qualified immunity shields government defendants from

not only liability but also litigation and discovery because "[i]nquiries of this kind can be peculiarly

disruptive of effective government." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982)).

"Although an officer's entitlement to qualified immunity is a threshold question to be resolved at

the earliest possible point, that point is usually summary judgment and not dismissal under Rule

12." *Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019).

 "A defendant is not entitled to qualified immunity at the pleadings stage if (1) 'the facts

alleged make out a violation of a constitutional right' and (2) that right 'was clearly established

when the event occurred so that a reasonable offic[ial] would have known that his conduct violated

it.'" *Myers*, 41 F.4th at 757 (quoting *Crawford v. Tilley*, 15 F.4th 752, 762–63 (6th Cir. 2021)).

Courts may address these two prongs in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236

(2009).  Regarding the first prong, the court views the facts in the light most favorable to the

plaintiff.  *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 695 (6th Cir. 2020); *Buddenberg*,

939 F.3d at 738.  Regarding the second prong, it is not necessary that there "be a case with the

exact same fact pattern, or even fundamentally similar or materially similar facts, so long as the

defendants had fair warning that their actions were unconstitutional." *Murray v. Ohio*, 29 F.4th

779, 790 (6th Cir. 2022) (internal quotation marks omitted).

 Here, as previously stated, the claims in the First Amended Complaint allege sufficient

factual content to plausibly show the violation of a constitutional right.  Additionally, at the time

of the events in this case, the law was clearly established that a legislative body that opens its

meetings with a prayer must employ a policy of nondiscrimination.  In *Greece*, 572 U.S. at 585–

86, a 2014 case, the Supreme Court upheld the practice of saying prayers before monthly town

board meetings and determined that while the local government was not required to achieve

"religious balancing" among the prayer givers, the government was required to employ a policy of nondiscrimination and make "reasonable efforts" to welcome a prayer by any minister or layperson who wished to give one.  The Supreme Court held that once government invites a prayer into the public sphere, the "government must permit a prayer giver to address his or her own God or gods as conscience dictates."  *Id.* at 582.  *See also Bormuth v. Cnty. of Jackson*, 870 F.3d 494, 507 (6th Cir. 2017) (en banc) (ultimately holding that Jackson County's invocation practice was consistent with the Supreme Court's decision in *Greece*).  Because the facts alleged by Reverend Cramer make out a violation of a clearly established constitutional right, Commissioner Moss is not entitled to qualified immunity at this stage in the litigation.

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 12) is DENIED.

**IT IS FURTHER ORDERED** that Defendants shall, not later than 21 days after entry of this Opinion and Order, file their Answer(s) to the First Amended Complaint (ECF No. 8).

Dated:  July 2, 2024                                          /s/ Jane M. Beckering
                                                                    JANE M. BECKERING
                                                                    United States District Judge

27